# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| ——————————————— | ) | |
| **RICHARD PAUL BREWER,** *et al.*, | ) | |
|  | ) | |
| **Plaintiffs,** | ) | |
|  | ) | |
| **v.** | ) | **Civil Action No.  08-0534 (ESH)** |
|  | ) | |
| **ISLAMIC REPUBLIC OF IRAN,** *et al.*, | ) | |
|  | ) | |
| **Defendants.** | ) | |
| ——————————————— | ) | |

## MEMORANDUM OPINION

On September 20, 1984, a suicide bomber drove a truck packed with explosives through the gates of the United States Embassy Annex building in East Beirut, Lebanon, killing fourteen people and wounding thirty-five.  The attack was carried out by Hezbollah, a terrorist organization that operates in Lebanon.[1]  This action has been brought by a surviving victim of the attack, Richard Paul Brewer, and his mother, Joyce Louise Leydet.  Plaintiffs allege that defendants, the Islamic Republic of Iran ("Iran"), the Ministry of Information and Security of Iran ("MOIS"), and the Iranian Revolutionary Guard Corps ("IRGC"), provided "material support and resources" for Hezbollah's attack and, therefore, have waived their sovereign immunity under the "state sponsor of terrorism" exception to the Foreign Sovereign Immunities Act of 1976 (the "FSIA"), 28 U.S.C. §§ 1602-1611.  Plaintiffs argue that defendants, having been stripped of immunity, are liable under federal law for causing personal injuries.  In this motion for default judgment, plaintiffs are seeking $12 million in compensatory damages for Mr. Brewer, $3.5

---

[1]This organization has several alternate spellings, including "Hizbollah" and "Hizballah."

million in compensatory damages for Ms. Leydet, and $300 million in punitive damages.[2]

Plaintiffs initiated this action on March 28, 2008, and effected service on December 7, 2008, in accordance with 28 U.S.C. § 1608(a)(4).  Defendants failed to respond, and the Clerk of Court entered a default on April 6, 2009.  Before plaintiffs can be awarded any relief, this Court must determine whether plaintiffs have established their claims "by evidence satisfactory to the court."  28 U.S.C. § 1608(e); *see also Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 232 (D.C. Cir. 2003).[3]  In evaluating plaintiffs' claims, the Court "may accept [plaintiffs'] uncontroverted evidence as true and may rely on sworn affidavits."  *Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d 258, 268 (D.D.C. 2003).  The Court is not required to hold an evidentiary hearing, *see Bodoff v. Islamic Republic of Iran*, 424 F. Supp. 2d 74, 78 (D.D.C. 2006), and "may take judicial notice of related proceedings and records in cases before the same court."  *Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105, 109 n.6 (D.D.C. 2005).  Based on the record herein, and relying upon related cases involving the same incident and defendants, this Court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

### I.  BACKGROUND

This action arises from the terrorist bombing of the U.S. Embassy Annex building in East Beirut, Lebanon on September 20, 1984.  On that morning, a suicide bomber in a station wagon

---

[2]Mr. Brewer's wife and sons, who are named as plaintiffs in the complaint, are not seeking relief in this motion.  Accordingly, this Court need not address their claims.

[3]This "satisfactory to the court" standard is the same as the standard for entry of default judgment against the United States under Federal Rule of Civil Procedure 55(e).  *See Hill v. Republic of Iraq*, 328 F.3d 680, 683-84 (D.C. Cir. 2003).

drove up a hill toward the Embassy, avoiding several concrete barriers designed to prevent such an approach.  *See Wagner v. Islamic Republic of Iran*, 172 F. Supp. 2d 128, 132 (D.D.C. 2001). The driver refused orders to stop and the vehicle was fired upon by Lebanese National Guards and British bodyguards escorting the British Ambassador.  *Id.*  The driver was hit before reaching the underground garage, which was his presumed destination because it would have caused even more devastating damage to the building.  *Id.*  Nevertheless, the bomb exploded and "demolished the embassy building," killing two U.S. servicemen, twelve Lebanese nationals, and wounding sixty other people.  *Id.*

When the bomb detonated, plaintiff Richard Paul Brewer, a United States Marine, was on guard duty on the second floor of the compound.  (Brewer Decl. ¶¶ 18-19).[4]  When he heard gunshots and yelling, he stood up to investigate.  (Brewer Decl. ¶ 19.)  After hearing more gunshots and a car engine revving, he headed for the balcony and yelled for people in his vicinity to get down.  (Brewer Decl. ¶ 19.)   At the moment he set foot on the balcony, the vehicle outside exploded.  (Brewer Decl. ¶ 20.)

Brewer was knocked unconscious by the blast for 30-45 minutes.  (Brewer Decl. ¶ 21.) When he finally came to, he went to the third floor to look for two of his friends who were also servicemen at the Embassy–Mike Wagner and Ken Welch.  (Brewer Decl. ¶ 23.)[5]  Brewer found Welch and Wagner lying on the floor and approached them to offer assistance.  (Brewer Decl. ¶ 23.)  However, he immediately discovered that Welch was dead and Wagner was unconscious

---

[4]At the time, Brewer was known as Richard Paul Leydet.  (Brewer Decl. ¶ 3.)

[5]As discussed herein, the estates of Wagner and Welch were the plaintiffs in two other civil actions pertaining to this attack.  *See Wagner v. Islamic Republic of Iran*, 172 F. Supp. 2d 128 (D.D.C. 2001); *Welch v. Islamic Republic of Iran*, No. 01-863 (D.D.C. 2007).

and covered with blood.  (Brewer Decl. ¶ 23.)  As Brewer was thinking of the best way to get

Wagner to safety, Wagner died in front of him.  (Brewer Decl. ¶ 23.)  Though he "felt a

tremendous shock and sense of rage building up" at the loss of his friends, Brewer seized upon

his training and went back downstairs to help with the rescue effort.  (Brewer Decl. ¶¶ 23-24.)  In

awarding Brewer the Navy Achievement Medal for his actions in the aftermath of the blast, the

Navy described what happened next.

> Despite being badly wounded and badly shaken, Sergeant
> [Brewer], with utter disregard for his own safety, courageously
> began evacuating the most severely wounded from the dangerous,
> unstable building.  He then took up a security post outside the
> building and refused to be relieved until he was ordered to the
> hospital for treatment.  Realizing the myriad tasks led [sic] to be
> done in the wake of the bombing, Sergeant [Brewer] insisted on
> immediately returning to duty, tirelessly assisting his fellow
> Marines in the clean up efforts for three sleepless days.  Sergeant
> [Brewer]'s boundless endurance, deep sense of responsibility, and
> selfless dedication to duty reflected credit upon himself and were
> in keeping with the highest traditions of the Marine Corps and the
> United States Naval Service.

(Brewer Decl. ¶ 27, Ex. A).  In addition to the Navy Achievement Medal, Brewer also received a

Superior Honor Award from the United States Department of State (Brewer Decl. ¶ 27, Ex. B)

and a Purple Heart for his injuries.  (Brewer Decl. ¶ 27, Ex. C.)

## A.  Extent of Brewer's Injuries

Brewer suffered both physical and mental injuries that have persisted to this day.  As a

direct result of the attack, Brewer twice lost consciousness (Brewer Decl. ¶ 21) and sustained

numerous cuts, contusions, and lacerations, but no broken bones.  (Brewer Decl. ¶ 25.)  His

immediate treatment consisted of blood transfusions, intravenous re-hydration therapy, and

stitches.  (Brewer Decl. ¶ 26.)  After spending three days assisting in the recovery efforts, he was

airlifted to a U.S. military hospital in Germany where he was treated for intense headaches and ringing in the ears, symptoms commonly associated with blast injuries.  (Brewer Decl. ¶ 28.) Brewer fulfilled the rest of his military obligations in Quantico, Virginia for another year and was honorably discharged from the Marine Corps in September 1985.  (Brewer Decl. ¶ 29.)

Upon returning home to the United States, Brewer felt anxious, depressed, and jittery so he isolated himself and became dependent on alcohol.  (Brewer ¶ 30.)  He was unable to stop thinking about the friends he lost in the terrorist attack.  (Brewer Decl. ¶ 30.)  He took some criminal justice courses in hopes of becoming an FBI or Secret Service agent, but dropped out of classes because he was bored and restless.  (Brewer Decl. ¶ 31.)  He then enrolled in the State Police Academy of Massachusetts and became a State Trooper in 1988, eventually being promoted to detective.  (Brewer Decl. ¶¶ 31-33).  In 1990, he married and moved out of his mother's home.  (Brewer Decl. ¶ 32.)

Despite enjoying his work as a detective, Brewer was drinking heavily and having problems in his marriage.  (Brewer Decl. ¶ 34.)  Because of an inability to control his "dangerous or inappropriate" impulses, he was forced to resign from his job and his marriage ended in a divorce.  (Brewer Decl. ¶ 35.)  He found work as a private security guard, but continued to feel isolated.  (Brewer Decl. ¶ 36.)  He struggled to resist impulses to use his firearm inappropriately and worried that minor disputes would cause him to use the weapon.  (Brewer Decl. ¶ 36.)  For those reasons, he left the security business and got a degree in special education and history in 1997.  (Brewer Decl. ¶ 37.)  He had an urge to return to Beirut to teach history, but the experience was not what he expected.  (Brewer Decl. ¶ 38-39.)  Brewer left Beirut and upon his return to United States, he met his current wife.  (Brewer Decl. ¶ 38-39.)  Brewer now has two

children and has found work as a high school history teacher in Portland, Maine.  (Brewer Decl. ¶ 39-40.)

Despite "establish[ing] a normal family life in [his] community," Brewer has continued to experience pain and suffering as a result of the terrorist attack in 1984.  (Brewer Decl. ¶ 41.)  He still suffers from depression, excessive drinking, lack of impulse control, inability to concentrate, headaches, and ringing in the ears.  (Brewer Decl. ¶ 42.)  In the mid-1990's, Brewer was diagnosed with Post Traumatic Stress Disorder (PTSD) but did not seek serious treatment for it until 2007 when he realized that he "owed it" to his wife and children.  (Brewer Decl. ¶ 45.)  He suffers from constant back pain and migraine headaches although these physical ailments are secondary to the psychological stress he continues to endure.  (Brewer Decl. ¶ 46.)  He suffers from nightmares and must be constantly careful not to let his "inner rage" erupt during minor confrontations.  (Brewer Decl. ¶ 46.)  He numbs his pains with alcohol, but is worried that his behavior is taking its toll on his wife and family.  (Brewer Decl. ¶ 47.)

In 2009, Dr. Benjamin C. Grasso, a Board-certified psychiatrist with the Veterans Administration in Saco, Maine examined Brewer.  Dr. Grasso found that Brewer displays evidence of "hypervigilance," including darting eyes, checking for exits, exaggerated reactions to quiet everyday sounds occurring in the outdoor hallway, constant foot tapping, and an overall sense of restlessness.  (Grasso Decl. ¶ 10.)  Brewer also continues to endure "hyperarousal, emotional numbing and avoidance, nightmares, daytime flashbacks, impulsivity, terror mixed with rage, impaired short term memory, impaired concentration, migraine headaches, lability of mood, and an inability to enjoy the usual circumstances of family life, social life, and employment because of [PTSD] and Traumatic Brain Injury."  (Grasso Decl. ¶ 12.)  These

symptoms will never disappear (Grasso Decl. ¶ 13), and Brewer "may be on the verge of significant further deterioration in functioning or even a break down." (Grasso Decl. ¶ 14.)

Dr. Edgar Garcia-Rill, a Professor in the Departments of Neurobiology and Developmental Sciences, and Psychiatry, at the University of Arkansas for Medical Sciences, reviewed Brewer's medical records and concluded that Brewer "suffers from severe [PTSD] which . . . severely limit[s] his ability to enjoy the normal pleasures and satisfactions of everyday life." (Garcia-Rill Rep. at 3, attached as Exhibit 6 to Pl.'s Mot.) He shows symptoms of Traumatic Brain Injury, "which adds to and exacerbates his difficulties." (Garcia-Rill Rep. at 3.) His symptoms are further worsened by "survivor's guilt" [from] discovering the bodies of two of his closest friends who were [killed] in the blast." (Garcia-Rill Rep. at 3.) Dr. Garcia-Rill concluded that "beyond any reasonable doubt, these deficits and impairments are caused by Mr. Brewer's exposure to the bomb blast caused by the terrorist attack in Beirut of September 20, 1984." (Garcia-Rill Rep. at 3.) Brewer's future is characterized as "severely limited" and the chances of other illnesses, such as accelerated aging and alcoholism, will increase over time. (Garcia-Rill Rep. at 3.) Brewer is currently rated as 70% disabled as a result of his PTSD by the Department of Veterans Affairs. (Garcia-Rill Rep., Ex. C)

**B.  Extent of Leydet's Injuries**

Joyce Louise Leydet, Brewer's mother, also seeks damages for her pain and suffering. She is, and has always been, a United States citizen. (Leydet Decl. ¶ 3.) Richard Brewer was her youngest of seven children, and Ms. Leydet described him as "joyful" and "happy-go-lucky" in high school. (Leydet Decl. ¶ 5.) When Ms. Leydet heard the news of the terrorist bombing on television, she saw images of someone in a marine uniform covered in blood and believed it was

her son.  (Leydet Decl. ¶ 10.)  Later that night, a Marine recruiter came to her house and

informed her that Brewer was injured, although he could not describe the nature of his injuries.

(Leydet Decl. ¶ 11.)  Leydet recalls this period of not knowing her son's condition as a "terrible

ordeal of anxiety and worry" for herself and her family.  (Leydet Decl. ¶ 13.)  Brewer called three

days later to inform his mother that he was wounded but recovering.  (Leydet Decl. ¶ 14.)  When

Brewer returned from overseas, he "was never really the same" according to Ms. Leydet.  (Leydet

Decl. ¶ 16.)  He screamed when he heard a car backfire on the street, (Leydet Decl. ¶ 16), was

"moody and silent for long periods," and seemed "depressed and anxious."  (Leydet Decl. ¶ 17.)

Ms. Leydet describes her life since the bombing as being "saddened and deeply and

negatively impacted by the physical and psychological trauma" inflicted on her son.  (Leydet

Decl. ¶ 21.)  She "especially feel[s] the loss of [her] happy, healthy young son, who seemed to

have limitless possibilities before him, and who has been replaced by a different Richard who has

to struggle to get through each day."  (Leydet Decl. ¶ 22.)  The entire experience has caused her

"deep emotional distress."  (Leydet Decl. ¶ 23.)

## CONCLUSIONS OF LAW

## I.  JURISDICTION UNDER THE FSIA

The Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602-1611, is the sole basis for

obtaining jurisdiction over a foreign state in United States.  *Argentine Republic v. Amerada Hess

Shipping Corp.*, 488 U.S. 428, 434 (1989).  Although it provides that foreign states are generally

immune from jurisdiction in U.S. courts, *see* 28 U.S.C. § 1604, a federal district court can obtain

personal and subject matter jurisdiction over a foreign entity in the following circumstances.

First, a court can obtain personal jurisdiction over a defendant if the plaintiff properly serves the

defendant in accordance with 28 U.S.C. § 1608.  *See* 28 U.S.C. § 1330(b).  Second, subject

matter jurisdiction exists if the defendant's conduct falls within one of the specific statutory

exceptions to immunity.  *See* 28 U.S.C. § 1330(a) and 28 U.S.C. § 1604.  Here, this Court has

jurisdiction because service was proper and defendants' conduct falls within the "state sponsor of

terrorism" exception set forth in 28 U.S.C. § 1605A.

### A.  Service of Process

As this Court explained in *Ben-Rafael v. Islamic Republic of Iran*:

> The FSIA establishes the requirements for proper service
> upon a foreign state or a political subdivision of a foreign state. *See*
> Fed. R. Civ. P. 4(j)(1).  The FSIA prescribes four methods of
> service, in descending order of preference.  Plaintiffs must attempt
> service by the first method (or determine that it is unavailable)
> before proceeding to the second method, and so on.  *See* 28 U.S.C.
> § 1608(a).
> The preferred method of service is delivery of the summons
> and complaint "in accordance with any special arrangement for
> service between the plaintiff and the foreign state."  28 U.S.C. §
> 1608(a)(1).  If no such arrangement exists, then delivery is to be
> made "in accordance with an applicable international convention
> on service of judicial documents."  *Id.* § 1608(a)(2).  If neither of
> the first two methods is available, plaintiffs may send the
> summons, complaint, and a notice of suit (together with a
> translation of each into the official language of the foreign state)
> "by any form of mail requiring a signed receipt, to be addressed
> and dispatched by the clerk of the court to the head of the ministry
> of foreign affairs of the foreign state concerned."  *Id.* § 1608(a)(3).
> Finally, if mailed service cannot be accomplished within thirty
> days, then the statute permits plaintiffs to request that the clerk of
> the court dispatch two copies of the summons, complaint, and
> notice of suit (together with a translation of each into the foreign
> state's official language) to the Secretary of State, who then "shall
> transmit one copy of the papers through diplomatic channels to the
> foreign state and shall send to the clerk of the court a certified copy
> of the diplomatic note indicating when the papers were
> transmitted."  *Id.* § 1608(a)(4).  "Strict adherence to the terms of
> 1608(a) is required."  *Transaero, Inc. v. La Fuerza Aerea*

*Boliviana*, 30 F. 3d 148, 154 (D.C. Cir. 1994).

540 F. Supp. 2d 39, 52 (D.D.C. 2008).

The first two methods of service are inapplicable to this case because there is no "special arrangement for service" between the U.S. and Iran, § 1608(a)(1), and Iran is not a party to any "international convention on service of judicial documents." § 1608(a)(2).

On June 24, 2008, plaintiffs requested the Clerk of the Court to effect service upon defendants pursuant to § 1608(a)(3), and the Clerk certified that she performed the requested mailing on July 10, 2008. However, no certification of service was received within thirty days, so on September 16, 2008, plaintiffs requested that the Clerk transmit the proper documents to the State Department for diplomatic service pursuant to § 1608(a)(4).[6] On September 29, 2008, the Clerk certified that she had complied with plaintiffs' request by mailing the proper documents to the State Department and requesting that they attempt service upon defendants through diplomatic channels. On March 26, 2009, the State Department informed the Court that service had been properly effected upon all three defendants, effective December 7, 2008.[7] Defendants did not respond or make an appearance within sixty days, § 1608(d), and the Clerk entered default on April 6, 2009. Because plaintiffs complied with the requirements of § 1608, service was proper, and this Court has personal jurisdiction over defendants.

---

[6]On December 1, 2008, after plaintiffs had already initiated service under § 1608(a)(4), the Clerk received a return receipt indicating that delivery of the original summons and complaint had been returned as undeliverable.

[7]The State Department enlisted the help of the Foreign Interests Section of the Embassy of Switzerland because the U.S. does not maintain diplomatic relations with the government of Iran. (*See* Return of Service Affidavit from the United States Department of State [Dkt. # 14]).

**B. Terrorism Exception to Sovereign Immunity**

The "state sponsor of terrorism" exception to sovereign immunity was recently amended by the enactment of the National Defense Authorization Act for Fiscal Year 2008 ("2008 NDAA"), Pub.L. No. 110-181, 122 Stat. 3, § 1083, which repealed § 1605(a)(7) of Title 28 and replaced it with § 1605A. This exception strips immunity where:

> money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if such act or provision of material support or resources is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.

28 U.S.C. § 1605A(a)(1). The key feature of the revised terrorism exception is that it creates a private federal cause of action against a "foreign state that is or was a state sponsor of terrorism . . . and any official, employee, or agent of that foreign state . . ." 28 U.S.C. § 1605A(c).[8] If immunity is waived, the Act provides for "economic damages, solatium, pain and suffering, and punitive damages." 28 U.S.C. § 1605A(c)(4).

However, before considering whether defendants' conduct falls within the statute, two requirements must be met. § 1605A(a)(2). First, the foreign state must have been "designated as

---

[8]Prior to the 2008 NDAA, there was no federal cause of action against a foreign state for acts of terrorism. The predecessor to the current exception, then codified at § 1605(a)(7), when read with the Flatow Amendment, § 1605 Note, provided a private right of action against *individual officers, employees, and agents* of a foreign state, but not against the foreign state itself. *See Cicippio-Puleo v. Islamic Republic of Iran*, 353 F.3d 1024, 1027 (D.C. Cir. 2004), *superseded by* 28 U.S.C. § 1605A. To recover damages against a foreign state directly, plaintiffs had to bring claims based on state law under 28 U.S.C. § 1606, which provides that "the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances." Here, plaintiffs asserted state law claims in their complaint, but their motion for default judgment seeks relief based only on a federal cause of action. Therefore, it is not necessary to address plaintiffs' state claims.

a state sponsor of terrorism at the time of the [terrorist] act." § 1605A(a)(2)(A)(i)(I).  Here, Iran

was formally declared a state sponsor of terrorism on January 23, 1984 in accordance with

section 6(j) of the Export Administration Act of 1979, 50 U.S.C. App. 2405(I).  *See* 49 Fed. Reg.

2836-02 (statement of Secretary of State George P. Shultz).  Second, the claimant must have

been "a national of the United States" at the time of the terrorist act.  § 1605A(a)(2)(A)(i)(II).

Brewer and Leydet have always been U.S. citizens.  Thus, these requirements have been met, and

this Court "shall" hear their claim.  § 1605A(a)(2).

    For defendants' conduct to fall within the "state sponsor of terrorism" exception, they

must have participated in an "extrajudicial killing" or provided "material support or resources for

such an act." § 1605A(a)(1); *see also Acosta v. Islamic Republic of Iran*, 574 F. Supp. 2d 15, 25

(D.D.C. 2008).  If so, immunity is waived and damages are authorized so long as defendants'

actions were a proximate cause of plaintiffs' injury.  § 1605A(c); *see also Ben-Rafael*, 540 F.

Supp. 2d at 54.  Here, plaintiffs alleged both that the bombing by Hezbollah constituted an

"extrajudicial killing" and that defendants provided the "material support and resources" required

to accomplish the bombing.

### 1. Extrajudicial Killing

    Whether this terrorist bombing by Hezbollah constituted an "extrajudicial killing"

warrants little discussion.[9]  As already determined by two judges of this Court, the attack on the

---

    [9]The FSIA refers to the Torture Victim Protection Act of 1991 ["TVPA"] for the definition of "extrajudicial killing."  *See* 28 U.S.C. § 1605A(h)(7).  The TVPA provides that "the term 'extrajudicial killing' means a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples. Such term, however, does not include any such killing that, under international law, is lawfully carried out under the authority of a foreign nation."  28 U.S.C. § 1350 Note.

U.S. Embassy Annex was a "deliberate and premeditated act" that killed fourteen people and

"[t]here is no evidence that it was judicially sanctioned by any lawfully constituted tribunal."

*Wagner*, 172 F. Supp. 2d at 134; *Welch v. Islamic Republic of Iran*, No. 01-863, (D.D.C. 2007)

(Report of United States Magistrate Judge Kay at 15 [hereinafter "Kay Report"] (finding that the

attack "clearly qualifies as an extrajudicial killing")).

### 2. Material Support

Similarly, the issue of whether defendants provided material support to Hezbollah in

carrying out the attack on the Embassy Annex has already been decided in *Wagner* and *Welch*.  In

*Wagner*, representatives of the Estate of Michael Wagner, a U.S. Navy Petty Officer who was

killed in the attack, sued Iran and MOIS under the FSIA for damages related to Wagner's death.

Although that case was analyzed under the pre-2008 NDAA "state sponsor of terrorism"

exception, the district court made findings about defendants' "material support" for the attack.

*Wagner*, 172 F. Supp. 2d at 133 (applying 28 U.S.C. § 1605(a)(7)).  The Court conducted an

evidentiary hearing on plaintiffs' motion for default judgment, and concluded as follows:

> The testimony of retired U.S. Ambassador Robert B.
> Oakley and Dr. Patrick L. Clawson, Director of Research at the
> Washington Institute for Near East Policy, together with
> declassified intelligence materials from the U.S. Department of
> State and the Central Intelligence Agency admitted into evidence
> by the Court, conclusively establish the identity of the perpetrators
> of the September 20, 1984, bombing of the U.S. Embassy in Beirut
> . . . to be the militant Islamic fundamentalist Shi'ite organization
> known as Hizballah, the Lebanese organization publicly committed
> to the expulsion of the American presence in Lebanon by terrorist
> means, as well as to the post-war reincarnation of Lebanon as an
> Islamic fundamentalist state.  Hizballah, in turn, has been shown to
> be an agency or instrumentality of the Iranian MOIS, employed
> (somewhat less publicly) by the MOIS to achieve similar ends-by
> terrorist means when necessary-as well to establish Iranian

> ascendancy as the premier Islamic patron of the Shi'a population in
> Lebanon.

*Id.* at 132.  The Court therefore found Iran and MOIS liable under the FSIA for the death of Petty

Officer Michael Wagner and assessed over $16 million in compensatory damages and $300

million in punitive damages.  *Id.* at 138.

Six years later in *Welch*, the Court found Iran and the IRGC liable to the estate of Army

Chief Warrant Officer Kenneth V. Welch for his death in the same terrorist attack.  United States

Magistrate Judge Kay held an evidentiary hearing on plaintiffs' motion for default judgment to

assess whether plaintiffs had produced "evidence satisfactory to the court" to sustain its burden

for a default judgment.  *Welch*, No. 01-863, Kay Report at 6.  At that hearing, Dr. Bruce D. Tefft,

a counter-terrorism specialist, testified that "Hezbollah was created by [Iran's] special committee

on terrorism in 1983, as a sort of wholly-owned subsidiary that was financed, trained, and

equipped by the Iranian government in an effort to influence affairs in Lebanon."  *Id.* at 10.  With

respect to this specific attack, "[s]atellite reconnaissance photographs taken by the United States

government of Lebanon revealed an identical, life-size model of the Embassy Annex in the

training camps in the Beka'a Valley.  . . .  There was a winding driveway with concrete barriers

and a replica of the building itself.  The model was built to use for practice before committing the

actual terrorist attack."  *Id.* at 12.  It was Dr. Tefft's expert opinion that Iran was responsible for

the attack, and, indeed, as found by the Magistrate Judge, Hezbollah claimed responsibility for

the attack, and Iran takes credit for the actions of Hezbollah.  *Id.*  Based on this evidence,

Magistrate Judge Kay concluded "that defendants provided 'material support or resources' for

-14-

the 'extrajudicial killing' committed at the embassy." *Id.* at 15.[10]

In the present case, plaintiffs have cited the testimony from *Wagner* and *Welch* at length, recognizing that the FSIA does not require this Court to relitigate issues that have already been settled. Instead, this Court "may take judicial notice of related proceedings and records in cases before the same court." *See Estate of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229, 263 (D.D.C. 2006). Defendants' connections to Hezbollah have been explored at length in this jurisdiction, and it has uniformly been agreed that in the relevant time period, Hezbollah received substantial funds and support from Iran via its Ministry of Information and Security and the Iranian Revolutionary Guard Corps. *See, e.g.*, *Ben-Rafael*, 540 F. Supp. 2d at 47; *Dammarell v. Islamic Republic of Iran*,404 F. Supp. 2d 261, 270-71(D.D.C. 2005). The *Wagner* and *Welch* opinions not only illustrate the general connection between Hezbollah and Iran, but also justify a specific finding that defendants provided support for the 1984 attack on the U.S. Embassy Annex in Lebanon. Relying on the pleadings and the above findings of other judges in this jurisdiction, this Court concludes that defendants provided "material support and resources" to Hezbollah in carrying out the September 20, 1984 attack on the Embassy Annex in East Beirut.

### 3. Causation

The next question is whether defendants' support of Hezbollah caused plaintiffs' injuries. *See* 28 U.S.C. § 1605A(c). The causation requirement under the FSIA is satisfied by a showing of proximate cause. *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1128-29 (D.C. Cir. 2004) (interpreting similar "caused by" language in the previous "state sponsor of terrorism" exception, § 1605(a)(7)). Proximate cause exists so long as there is "some

---

[10]Judge Kollar-Kotelly, the presiding judge, adopted Magistrate Judge Kay's report.

reasonable connection between the act or omission of the defendant and the damages which the

plaintiff has suffered." *Id.* (citations omitted). From defendants' actions of supplying resources

and training to Hezbollah for this attack, it was entirely foreseeable that innocent people would

be killed or injured by the detonation of a van filled with explosives. *See Ben-Rafael*, 540 F.

Supp. 2d at 54. Thus, the proximate cause test is easily satisfied here.

In sum, subject matter jurisdiction over defendants is proper under § 1605A, and

plaintiffs have provided satisfactory evidence to sustain a cause of action for damages.

## II. DAMAGES UNDER THE FSIA

### A. Compensatory Damages

Plaintiffs' motion for default judgment seeks $300 million in punitive damages, $12

million for Brewer's pain and suffering, and $3.5 million for Leydet's pain and suffering. The

FSIA authorizes economic, solatium, pain and suffering, and punitive damages against a foreign

state and its officers, employees, or agents. *See* 28 U.S.C. § 1605A(c). Because Brewer survived

this attack, his claim for pain and suffering should be compared to awards in similar cases where

the plaintiff has survived the attack. *See Blais v. Islamic Republic of Iran*, 459 F. Supp. 2d 40,

58 (D.D.C. 2006) ("In determining the appropriate amount of compensatory damages, the Court

may look to prior decisions awarding damages for pain and suffering"); *Haim v. Islamic Republic

of Iran*, 425 F. Supp. 2d 56, 71 (D.D.C. 2006) (outlining the different types of plaintiffs in

terrorism cases). There is no standard recovery amount for surviving victims of terrorist attacks;

instead, "courts typically award a lump sum, and in so doing, articulate several factors as

relevant: the severity of the pain immediately following the injury, the length of hospitalization,

and the extent of the impairment that will remain with the victim for the rest of his or her life."

*Haim*, 425 F. Supp. 2d at 73.  For the pain and suffering of relatives who were not present at the

site of the attack, damages "must be determined by the nature of the relationship and the severity

and duration of the pain suffered by the family member."  *Id.* at 75.  The standard award to

parents of survivors of terrorist attacks is $2.5 million in pain and suffering damages, in the

absence of exceptional circumstances.  *See Peterson v. Islamic Republic of Iran*, 515 F. Supp. 2d

25, 52 (D.D.C. 2007).

### 1. Brewer's Damages

Brewer, in seeking $12 million in damages, compares the pain and suffering that he

endured, and continues to endure, with two other cases in which a victim survived a terrorist

attack but suffered injuries that will likely last for a lifetime.  Brewer argues that an award of $7

million is a "fair minimum" based on *Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d

258 (D.D.C. 2003).  In that case, the plaintiff Jenny Rubin was awarded $7 million in

compensatory damages against the same defendants for injuries she sustained as a result of a

1997 suicide bombing in a pedestrian mall in Jerusalem.  *Id.* at 261.  Ms. Rubin was present at

the scene of the bombing and taken to a hospital, but was soon released because she exhibited

"no obvious physical injuries."  *Id.* at 265.  Presently, "Ms. Rubin has permanent tinnitus, a

constant ringing or buzzing sound, which disrupts concentration and her ability to think and

sleep.  As a result, Ms. Rubin's concentration and memory are permanently impaired."  *Id.*  She

has been diagnosed with "elective mutism, a psychiatric brain condition" and "exhibits common

symptoms of PTSD including paranoia, fear, emotional reactions to news of other terrorist

attacks, and depression."  *Id.*

At the other end of the spectrum, Brewer asserts that $20 million in compensatory

damages is a "fair maximum" when comparing his damages to those of Paul Blais, a pilot in the
United States Air Force who was severely injured in the terrorist bombing of a residential
complex in Dhahran, Saudi Arabia in 1996.  *Blais*, 459 F. Supp. 2d at 47.  After that attack, Mr.
Blais fell into a coma and then a vegetative state for five weeks.  *Id.* at 59.  He "suffered severe
brain trauma and deprivation of oxygen, and had to be given a tracheotomy in order to enable
him to breathe."  *Id.*  He spent four months in the hospital and currently suffers from "diminished
motor skills, short term memory impairment, and has had trouble writing and reading . . . [His]
daily functions remain woefully impaired; he continues to have trouble with his speech, balance,
and coordination."  *Id.*  The Court in *Blais* awarded $21.8 million in compensatory damages.  *Id.*

Based on the $7 million awarded in *Campuzano* and the $21.8 million awarded in *Blais*,
Brewer asserts that $12 million in this case is "justified and well-supported by applicable
precedent."  (Pl.'s Mot. at 23.)  However, a review of damage awards in other terrorism cases and
a comparison Brewer's pain and suffering with the plaintiffs in those other cases suggests that an
award of less than $12 million is appropriate.

Damages of $12 million were awarded in at least two other cases in which the plaintiffs
suffered more severe injuries than Brewer.  In *Mousa v. Islamic Republic of Iran*, the plaintiff
was awarded $12 million for pain and suffering after sustaining severe burns and blast injuries to
her lungs, skull, face, and hand from a suicide bombing of a bus in Israel.  238 F. Supp. 2d 1, 5
(D.D.C. 2001).  Ms. Mousa was hospitalized for a month, spent nine days in a rehabilitation
center, and received continuos treatment for three more months.  *Id.* at 5-6.  She currently suffers
from "numerous permanent injuries including hearing loss, blindness in one eye, loss of function
in her dominant hand, disfigurement, burn scars, concentration problems, walking difficulties,

-18-

breathing impairment, and PTSD." *Id.* at 6-7.  In *Peterson*, a case arising from the 1983 terrorist

bombing of United States Marine barracks in Beirut by Hezbollah, in which 241 American

servicemen were killed, plaintiff Larry Gerlach was awarded $12 million for pain and suffering.

515 F. Supp. 2d at 55.  He survived the attack but sustained a broken neck which resulted in

permanent quadriplegia and severe psychological trauma.  *Id.* at 55.  While recognizing the

difficulty of quantifying and comparing pain and suffering, Brewer's injuries do not appear to be

as severe as those sustained by Ms. Mousa and Mr. Gerlach.

The request of $12 million would also appear to be too high when one compares Brewer's

pain and suffering with the plaintiff in *Haim*, who was awarded $11 million.  There, the plaintiff

survived the terrorist bombing of a bus in Israel in 1995, but "[a]s a result of the explosion,

shrapnel punctured [plaintiff's] body and skull in several locations, and other parts of his body

were wounded and bleeding. [He] suffered from tremendous pain and a loss of vision."  425 F.

Supp. 2d at 61.  His brain was crushed and his family was originally told that he would not

survive.  *Id.* at 62.  He was later determined to have a 77% permanent vision disability, including

complete loss of vision on the left side and a loss of visual memory and spatial recognition.  *Id.*

at 63-4.  Among other psychological problems, he suffers from "severe chronic [PTSD]," and "it

is highly unlikely that he will ever obtain a job or live independently."  *Id.* at 66.  Again, without

discounting Brewer's injuries, he does not appear to have endured as much pain and suffering as

the plaintiff in *Haim*.

Brewer's pain and suffering can be compared to cases in which plaintiffs were awarded

damages ranging anywhere from $4 million to $7 million, although his injuries do not fall neatly

within that range.  At $4 million in damages, Brewer's injuries are somewhat similar to those

sustained by each of two plaintiffs who were shot while trying to apprehend an assassin in New

York.  *Acosta*, 574 F. Supp. 2d at 20.  One plaintiff was shot in the leg, suffered "excruciating

pain," underwent numerous blood transfusions, and had to be hospitalized for over thirty days.

*Id.* at 23.  The second plaintiff was shot in the chest and shoulder while wearing a bulletproof

vest.  *Id.* at 20.  He suffered a heart attack shortly after returning to duty and was forced to retire

early.  *Id.* at 23.  Each of the *Acosta* plaintiffs has lingering physical effects and suffers from

severe emotional distress.  *Id.*

At $7 million in damages, Brewer's pain and suffering is comparable to, if not more

severe than, Ms. Rubin's pain and suffering in *Campuzano*.  Like Brewer, Ms. Rubin suffers

from ringing in the ears, some memory loss, and PTSD.  However, she had no obvious physical

injuries, whereas Brewer lost consciousness twice and required blood transfusions and stitches.

While the above cases suggest that Brewer's damages could arguably be more than the $7

million awarded in *Campuzano*, the *Peterson* case, arising from a similar bombing in Beirut in

1983, complicates the analysis.  There, several plaintiffs received awards of $7 million or less for

injuries that are arguably more severe than Brewer's.  *Peterson*, 515 F. Supp. 2d at 55.  For

example, one plaintiff received $7 million in pain and suffering because of a shrapnel wound to

the forehead that destroyed the middle part of his nose, a perforated eardrum, and severe PTSD.

*Id.*  Another plaintiff received $5 million for a broken jaw, severe flesh wounds and scarring on

the arms, legs and face, a loss of teeth, and PTSD.  *Id.* at 54.

As the above cases demonstrate, there is no exact comparison, and, indeed, strict

application of precedent could lead to conflicting conclusions about an appropriate award.  This

Court readily acknowledges that it is "undeniably difficult" to assess the amount of compensatory

damages for the pain and suffering of surviving victims of terrorist attacks, especially where severe mental anguish is involved.  *Blais*, 459 F. Supp. 2d at 59.  Each victim's suffering is unique, and, therefore, comparing the severity of the mental anguish endured by one victim to another is undoubtedly an inexact science.  Moreover, it is often difficult to reconcile cases which have awarded different amounts for seemingly similar injuries.

Since this terrorist attack in 1984, Brewer has battled depression, anxiety, alcoholism, and many other ailments.  Although he is currently married with two children and has a career as a teacher, the attack continues to hamper his ability to enjoy life's daily pleasures.  He has experienced severe and permanent pain and suffering and his outlook for the future is described by physicians as "severely limited."  Taking into account all of these factors and the apparent permanency of his injuries, this Court finds that Richard Paul Brewer is entitled to $7 million in compensatory damages for the pain and suffering he has endured as a result of the 1984 terrorist attack on the U.S. Embassy Annex in East Beirut.

### 2.  Leydet's Damages

In *Peterson*, Judge Lamberth set out a framework which provides that a parent of a serviceman injured in a terrorist attack is ordinarily entitled to $2.5 million.  *Peterson*, 515 F. Supp. 2d at 52; *see also Campuzano*, 281 F. Supp. 2d at 276-77 (awarding $2.5 million to each parent of surviving victims of terrorist attacks).  Here, however, Leydet compares her pain and suffering to the parents in *Blais* where each parent was awarded $3.5 million.  *Blais*, 459 F. Supp. 2d at 60.  The parents in *Blais* "experienced anguish" during the three days after the attack on the Marine barracks because they did not know whether their son was dead or alive.  *Id.*  After learning that their son had survived, the parents' relationship with Blais "changed drastically"

and they moved in with their son throughout his rehabilitation process.  *Id.*  Blais' parents have

since "tirelessly devoted themselves to their son's rehabilitation, with [the mother] acting as Mr.

Blais' full-time caretaker and nurse," and have experienced "a great deal of emotional distress as

a result of seeing their son in such a state."  *Id.*

The award in *Blais*, however, was characterized in *Peterson* as "exceptional" because of

the severity of the son's injuries, his five weeks in a coma and vegetative state, and the fact that

the parents gave up their jobs to take full-time care of their son.  *Peterson*, 515 F. Supp. 2d at 52

n.30 (discussing *Blais*, 459 F. Supp. 2d at 60).  Without discounting the pain and suffering

experienced by Ms. Leydet, the facts here weigh against departing from the standard $2.5 million

award.  Although Ms. Leydet, like the parents in *Blais*, spent several days not knowing the fate of

her son, the evidence she has presented does not indicate that the terrorist attack changed her life

as drastically as the parents in *Blais*.[11]  Therefore, an award of $2.5 million is appropriate.

### B.  Punitive Damages

Prior to the 2008 NDAA, punitive damages were only available against officials,

employees, or agents of a foreign state, but not the foreign state itself.  *See* 28 U.S.C. § 1605

Note (The "Flatow Amendment") and 28 U.S.C. § 1606; *see also Roeder*, 333 F.3d at 234 n.2.

The 2008 NDAA repealed this scheme and now expressly provides that punitive damages are

---

[11]Compensatory damages of $3.5 million were also awarded to the father of a surviving victim of a 1995 terrorist bombing in Israel in *Haim*.  There, the father of Mr. Haim (whose injuries are described above) was initially led to believe that his son was killed. 425 F. Supp. 2d at 62.  Over the course of his son's treatment, Mr. Haim lived at a hotel and spent most of his days at the hospital with his son.  *Id.* at 63.  The father "suffered extreme emotional distress due to the uncertainty of [his son's] condition" and has "effectively put his own life on hold in order to care for his son."  *Id.* at 67.  This award also relies on the drastic changes to the parent's life in order to care for the child and those circumstances are not present in Ms. Leydet's case.

available against officials, agents and employees of a foreign state, *as well as the foreign state itself.* 28 U.S.C. 1605A(c). Plaintiffs seek $300 million in punitive damages.[12]

The Restatement (Second) of Torts provides that punitive damages are intended "to punish [a defendant] for his outrageous conduct and to deter him and others like him from similar conduct in the future." RESTATEMENT (SECOND) OF TORTS § 908(1) (1977). To determine the proper amount of punitive damages, courts consider four factors: "(1) the character of the defendant's act, (2) the nature and extent of harm to the plaintiffs that the defendants caused or intended to cause, (3) the need for deterrence, and (4) the wealth of the defendants." *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 32 (D.D.C. 2008) (citing RESTATEMENT (SECOND) OF TORTS § 908(1)-(2) (1965)). In similar terrorism cases against these defendants, courts in this district have typically applied a "formula of three times defendant Iran's annual expenditure on terrorism." *Acosta*, 574 F. Supp. 2d at 31. In prior cases, expert testimony has established that during the relevant time period, Iran's annual expenditures on terrorism were $50 to $150 million, resulting in typical punitive damage awards of $300 million. *Id.* (citations omitted). In *Wagner*, the Court followed this standard formula and assessed $300 million in punitive damages. *Wagner*, 172 F. Supp. 2d at 138.

---

[12]In their motion for entry of default judgment, it is unclear whether plaintiffs seek $300 million in punitive damages against *each* defendant for a total of $900 million or jointly and severally against all three defendants for a total of $300 million. However, punitive damages in terrorism cases are typically awarded jointly and severally regardless of how many defendants are named and eligible to pay punitive damages. *See, e.g., Acosta*, 574 F. Supp. 2d at 31 (assessing punitive damages against Iran and MOIS "jointly and severally"); *Stern v. Islamic Republic of Iran*, 271 F. Supp. 2d 286, 301 (D.D.C. 2003) (four defendants held "jointly and severally" liable for $300 million instead of each being subject to a separate $300 million penalty). Therefore, the motion will be read as seeking punitive damages for plaintiffs and against defendants Iran, MOIS, and the IRGC, jointly and severally, in the amount of $300 million.

There is no reason to depart from settled case law regarding the amount of punitive damages in terrorism cases.  Taking into account the <u>Restatement</u> factors and the nature of the attack, this Court finds defendants Iran, MOIS, and the IRGC to be jointly and severally liable for punitive damages in the amount of $300 million.

## CONCLUSION

For the foregoing reasons, plaintiffs' motion for default judgment is GRANTED and the Court enters judgments in the amounts specified above.  A separate Order and Judgment accompanies this Memorandum Opinion.


_____/s/_____
ELLEN SEGAL HUVELLE
United States District Judge


Date: October 15, 2009

-24-